## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

**ANTHONY ABBOTT, ERIC FANKHAUSER,**
**LLOYD DEMARTINI, TOM JOHNSON,**
**JACK JORDAN, MARK LANG,**
**EDWARD ROSA, and DENNIS TOMBAUGH,**
**individually and on behalf of all those**
**similarly situated,**

        **Plaintiffs,**

**v.**

**LOCKHEED MARTIN CORPORATION,**
**LOCKHEED MARTIN INVESTMENT**
**MANAGEMENT COMPANY,**

        **Defendants.**

**CASE NUMBER 06-701-MJR**

**JURY TRIAL DEMANDED**
**CLASS ACTION COMPLAINT**

## <u>COMPLAINT FOR BREACH OF FIDUCIARY DUTY</u>

### INTRODUCTION

1.      Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement.  For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.      In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical.  Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses.  Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor."  The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industries.  ERISA requires that the fees for these services be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants.  At worst, they are excessive, undisclosed, and illegal.

10.     In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Lockheed Martin Corporation Salaried Savings Plan (the "Salaried Plan"), Plan 017, seek to recover the losses suffered by the Salaried Plan on a plan wide basis and to obtain injunctive and other equitable relief for the Salaried Plan from the Salaried Plan's fiduciaries based upon their breaches of their fiduciary duties.

11.     Also in this action, pursuant to ERISA § 502(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Lockheed Martin Corporation Hourly Savings Plan Plus (the "HSP Plan"), Plan 018, seek to recover the losses suffered by the HSP Plan on a plan wide basis and to obtain injunctive and other equitable relief for the HSP Plan from the HSP Plan's fiduciaries based upon their breaches of their fiduciary duties.

12.     As set forth in detail below, the fees and expenses paid by the Plans, and thus borne by the participants in the Plans, were and are unreasonable and excessive; not incurred solely for the benefit of the Plans and their participants; and undisclosed to participants.  By subjecting the Plans and their participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

13.     Plaintiff and Class Representative Anthony Abbott lives in O'Fallon, Illinois, within the Southern District of Illinois.  He is a participant in the HSP Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Plaintiff and Class Representative Col. Eric Fankhauser (Ret.) lives in O'Fallon, Illinois, within the Southern District of Illinois.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

15.     Plaintiff and Class Representative Lloyd DeMartini lives in Livermore, California.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

16.     Plaintiff and Class Representative Tom Johnson lives in Watsonville, California.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

17.     Plaintiff and Class Representative Jack Jordan lives in Pahrump, Nevada. He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

18.     Plaintiff and Class Representative Mark Lang lives in Santa Cruz, California.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

19.     Plaintiff and Class Representative Edward Rosa lives in San Diego, California.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff and Class Representative Dennis Tombaugh lives in Concord, California.  He is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

21.     Defendant Lockheed Martin Corporation is a Maryland corporation with its principal executive office in Bethesda, Maryland.  According to its promotional and investor-related materials, Lockheed Martin is engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services, having business operations in aeronautics, electronics systems, space systems, integrated systems and services, and information and technology services. It has operations and facilities across the U.S. and abroad, including a facility and employees located within the Southern District of Illinois.  It is licensed to do business in Illinois.  Lockheed Martin Corporation is a Plan Administrator of the Salaried Plan and of the HSP Plan, and a named fiduciary to the Plans within the meaning of ERISA §§ 402 and 403, 29 U.S.C. §§ 1102 and 1103.  In this role, it has the authority and discretion to appoint, remove and replace third-party service providers to the Plans.  It also is a fiduciary to both Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     Defendant Lockheed Martin Investment Management Company (LMIMCo) is a wholly owned subsidiary of Lockheed Martin that manages Lockheed Martin's employee benefit trusts.  Although it is a separate legal entity, it has no personnel or operations separate from Lockheed Martin.  LMIMCo is responsible for the Plans' investments, and the appointment, removal and replacement of investment

managers and trustees.  It has the authority and discretion to establish funding and investment policies for the Plans, to manage the assets of the Plans, to designate funds as investment funds, to add or delete investment funds and to prescribe any necessary or appropriate rules regarding the availability of investment funds.  LMIMCo is also a named fiduciary of the Salaried Plan, the HSP Plan, and the Lockheed Martin Defined Contribution Plans Master Trust within the meaning of ERISA §§ 402 and 403, 29 U.S.C. §§ 1102 and 1103.  As such, it is a fiduciary with respect to the Salaried Plan and the HSP Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Jurisdiction and Venue

23.     Plaintiffs seek relief on behalf of the Plan through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

24.      All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

25.     Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the damages occurred directly to Plaintiffs in this district where they live, because breaches of fiduciary duty occurred in this district and because the Defendants may be found in this district.

### The Plaintiff Classes

26.     Plaintiffs Fankhauser, De Martini, Johnson, Jordan, Lang, Rosa and Tombaugh bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries.  They seek to represent the following Class (the "Salaried Plan Class"):

> All persons, *excluding the Defendants and/or other*
> *individuals who are or may be liable for the conduct*
> *described in this Complaint,* who were or are participants
> or beneficiaries of the Salaried Plan and who were or may
> have been affected by the conduct set forth in this
> Complaint, as well as those who will become participants
> or beneficiaries of the Plan in the future.

27.    Plaintiff Abbott brings this action pursuant to Rule 23 of the Federal Rules

of Civil Procedure, on behalf of himself and all similarly situated HSP Plan participants

and beneficiaries.  He seeks to represent the following Class (the "HSP Plan Class"):

> All persons, *excluding the Defendants and/or other*
> *individuals who are or may be liable for the conduct*
> *described in this Complaint,* who were or are participants
> or beneficiaries of the HSP Plan and who were or may have
> been affected by the conduct set forth in this Complaint, as
> well as those who will become participants or beneficiaries
> of the HSP Plan in the future.

28.    Certification of this class is proper under Rule 23(a) because all

prerequisites are satisfied:

a.    **Numerosity.**  The members of the Class are so numerous that joinder of

all members is impracticable.  Although the Plaintiffs do not know the

exact number of Class members as of the date of filing, there were

108,169 participants with account balances in the Salaried Plan at the end

of the 2004 plan year.  At the end of the 2004 plan year, there were

11,309 participants with account balances in the HSP Plan.

b.    **Commonality.**  Common issues of fact and law predominate over any

issues unique to individual class members.  Issues that are common to all

class members include, but are not limited to, whether the Defendants:

i.   Charged fees and expenses to the Plans that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

ii.   Caused the Plans to enter into agreements with third parties which caused and/or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iii.   Failed to monitor the fees and expenses paid by the Plans and, by such failure, caused or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iv.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

v.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of the participants and beneficiaries of the Plans;

vi.   Failed properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

vii.   Failed to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transaction fees and

expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii.   Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against assets of the Plans and by failing to stop such hidden excessive fees;

ix.   Appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee the performance of those fiduciaries and to ensure that they were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;.

x.   In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plans, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xi.   Caused and/or allowed fees and expenses to be paid by the Plans for purposes other than those allowed by ERISA;

xii.   By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plans, participants and beneficiaries of the Plans, and members of the classes;

xiii.  Are liable to the Plans and the classes for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xiv.  Are responsible to account for the assets and transactions of the Plans and should be charged for any transactions and payments for which they cannot account.

c.  **Typicality.**  The claims brought by the Plaintiffs are typical of those of the absent class members because:

i.  The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of the Classes;

ii.  The Defendants' breach of those obligations constitutes a breach to each participant and each member of the classes;

iii.  To the extent that there are any differences among class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plans.  Such minimal and formulaic differences are no impediment to class certification.

d.  **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of

the classes' claims.  The Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

29.     Class certification is also appropriate under Rule 23(b) and each subpart because:

a.   Pursuant to Rule 23(b)(1), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

b.   Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to each class as a whole;

c.   Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.


## FACTS

### The Plans

30.     Lockheed Martin offers certain of its employees, and certain employees of its subsidiaries, the opportunity to participate in the Salaried Plan and the HSP Plan as part of their compensation and benefits.

31.     The Salaried Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee stock ownership plan provision. It is a tax-qualified plan of the type popularly known as a "401(k) plan."

32.     Like the Salaried Plan, the HSP Plan is a defined contribution plan containing an employee stock ownership plan provision and is a tax-qualified 401(k) plan.

11

33.     Lockheed Martin benefits from its sponsorship of the Plans because the opportunity to participate in the Plans enhances its ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Lockheed Martin to tax advantages under the Internal Revenue Code.

34.     Under the terms of the Salaried Plan, qualified employees may contribute a percentage of their before-tax and after-tax earnings to the Salaried Plan.  Lockheed Martin will make matching contributions in varying percentages of the employees' eligible compensation.  The same is true of the HSP Plan, except that Lockheed Martin's matching contribution may depend on the terms of a collective bargaining agreement. Participants are 100 percent vested in their accounts, including the matching contribution portion.

35.     Each participant's account is credited with the participant's contributions, the participant's share of matching contributions, and the Plans' earnings.

36.     Both the Salaried Plan and the HSP Plan operate in connection with a master trust, the Lockheed Martin Defined Contribution Plans Master Trust ("Master Trust").

37.     A "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to 401(k) plan or plans.  Plan sponsors and administrators generally utilize master trusts in seeking to achieve efficiency or economies of scale in administering multiple 401(k) plans for an employer or related-employer group (*e.g.* a company or related companies that maintain salaried and hourly employee plans; or plans formerly sponsored or administered by a company which the employer acquired and/or with whom the employer merged).

38.     Through a master trust structure, several 401(k) plans may invest in common investment options or funds offered in the master trust and may share the services of master trust record-keepers, investment managers, consultants, and other service providers.  The fees incurred for such services typically are allocated among participating plans based upon each plan's proportionate share of the assets in the master trust.

39.     This is true here.  The Defendants formed the Master Trust, pursuant to an agreement with State Street Bank & Trust Company, the trustee.  The Master Trust holds the assets of a number of Lockheed Martin's retirement plans, the two largest plans being the Salaried Plan (approximately 89% of the Master Trust assets) and the HSP (approximately 5% of the Master Trust assets).  All of the plans in the Master Trust share the services of record keepers, investment managers and other providers.  The fees for these services are allocated on a *pro rata* basis among the plans.

40.     Participating employees may choose to invest Salaried Plan or HSP Plan contributions in any of thirteen investment funds.  Five of these funds are retail mutual funds, the same mutual funds available for retail purchase, by any investor, large or small, on the open market.  Although the Plans, as large investors, would qualify for the purchase of "institutional" mutual fund shares, which charge substantially lower fees than the standard shares offered to retail customers, the Plans did not make these available to participants in all of the mutual fund investment options.

41.     Four additional funds are "commingled funds."  Commingled funds, such as the ones in the Plans, are similar to mutual funds because they pool money from more than one investor and invest in many different underlying securities.  Unlike mutual funds,

however, commingled funds are not available to the retail customer, but are available only to institutional investors such as pension plans or large 401(k) plans.

42.     Another three of the funds are "funds of funds":  the Aggressive Asset Allocation Fund, the Conservative Asset Allocation Fund, and the Moderate Asset Allocation Fund.  Each of these funds consists of a bundle of other funds, combined in different percentages, to allow for increased (or decreased) risk and reward.

43.     The Stable Value Fund, instead of investing in stocks or bonds, invests in U.S. Treasury bills, commercial paper, banker's acceptances and notes, savings bank deposits, commingled money market funds and other short-term fixed securities.  The Stable Value Fund also invests in contracts with insurance companies.  Under the terms of these contracts, known as "GICs" or "guaranteed investment contracts," the insurers promise to repay the principal and a contractually fixed rate of interest (the "stated rate") over a specific period of time.  The insurance company then invests the money, seeking a higher return than the stated rate it has promised to pay.

44.     The Plans also offer participants and beneficiaries the option of investing in the Company Common Stock Fund, a fund that holds Lockheed Martin Corporation common stock.

45.     By the end of 2005, the Master Trust held more than $14 billion in assets.

**The Defendants' Fiduciary Duties Owed To The Plans Under ERISA**

46.     ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**  (Emphasis added).

47.      ERISA §§ 404(a)(1)(A)&(B) of  ERISA, 29 U.S.C. § 1104(a)(1)(A) &

(B), require that the Plan's fiduciaries "shall discharge [their] duties with respect to a

plan solely in the interest of the participants and beneficiaries" and:

    a.  [F]or the exclusive purpose of:
        i.  providing benefits to participants and their beneficiaries;
           and
        ii.  defraying reasonable expenses of administering the plan;
           and
    b.  [W]ith the care, skill, prudence, and diligence under the
       circumstances then prevailing that a prudent man acting in a like capacity
       and familiar with such matters would use in the conduct of an enterprise of
       a like character and with like aims.

48.      ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be

held liable for breaches of fiduciary duty committed by another fiduciary where

    (1) the fiduciary "participates knowingly in, or knowingly undertakes to
    conceal, an act or omission of such other fiduciary, knowing such act or
    omission is a breach";
    (2) the fiduciary, by his or her "failure to comply with section 1104 (a)(1)
    in the administration of his specific responsibilities which give rise to his
    status as a fiduciary" enables "such other fiduciary to commit such a
    breach"; or
    (3) the fiduciary "has knowledge of a breach by such other fiduciary," and
    does not make "reasonable efforts under the circumstances to remedy the
    breach."

49.      ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the

Plan and "parties in interest."  This section provides that unless subject to an exemption

as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

    shall not cause the plan to engage in a transaction,… if he knows or should
    know that such a transaction constitutes a direct or indirect – sale or
    exchange, or leasing, of any property between the plan and a party in
    interest … furnishing of goods, services or facilities between the plan and
    a party in interest; … transfer to, or use by or for the benefit of, a party in
    interest, of any assets of the plan.  29 U.S.C. § 1106(a)(1).

50.     For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

51.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

52.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description ("SPD").

53.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information " as is necessary to fairly summarize the latest annual report."

54.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

> [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

> [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

55.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from the Plan Administrator on request.

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

56.     ERISA §103(b)(2) & (3), 29 U.S.C. §1023(b)(2) & (3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report" a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

57.     ERISA § 404(c) provides to Plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in their 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts.  To be eligible for the protection of this "safe harbor," plan fiduciaries must, among other things, provide:  "an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and must provide "a participant or beneficiary with an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested."  29 C.F.R. §2550.404c-1(b)(1).

58.     For a participant or beneficiary to be deemed to have "an opportunity to exercise control over assets in his individual account" within the meaning of 404(c), the plan fiduciaries must provide him or her with "the opportunity to obtain sufficient

information to make informed decisions with regard to investment alternatives available under the plan." 29 C.F.R. §2550.404c-1(b)(2)(i)(B).

59.     The "sufficient investment information" that plan fiduciaries must provide to participants includes:

> A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*.

It must also include, at least upon request,

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

60.     ERISA's safe harbor regulations state that the imposition of *reasonable* charges for *reasonable* plan expenses does not interfere with a participant's opportunity to exercise control over his/her individual account so long as *plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plans

61.     The Defendants, directly or indirectly, have caused the Plans to purchase services from various plan service providers, including trustee, record-keeping,

18

administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

62.     Through the Master Trust, the Defendants have caused the amounts that the Plans pay for these services to be assessed against participants' accounts.

63.     Through the Master Trust, the Defendants have caused or allowed these service providers to receive payment in at least one of two ways:

    a.   By direct disbursement from the Master Trust to the entity providing the service; and/or

    b.   By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of assets of the Plans distributed between and/or among various service providers.

### **"Hard Dollar" Payments to Plan Service Providers**

64.     Payments in the form of direct disbursements from the Plans to service providers are known as "Hard Dollar" fees  They are usually paid in a straightforward manner – the plan sends the service provider a check.

65.     Hard Dollar fees may also be paid by a master trust, as they are here.  Those fees are paid in the same manner – by sending a check to the service provider – and are usually for the same types of services as the plan pays.

66.     The Plans and the Master Trust disclose to government regulators and participants in the Plans, in one form or another, the Hard Dollar payments that are made to service providers using the Plans' assets.  For example, in 2004, the assets of the Plans were used to pay Citistreet more than $8 million dollars for recordkeeping.

67.     Based upon this disclosure, understanding the Plans' recordkeeping expenses for 2004 *appears* straightforward:  The Master Trust sent a check to Citistreet and, in exchange, Citistreet provided recordkeeping services to the Plans.

68.     However, these disclosed Hard Dollar expenses are not all of the fees that participants in the Plans pay.

### Revenue Sharing Payments to Plan Service Providers

69.     Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

70.     Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

71.     Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common or collective trusts, insurance companies offering GIC's, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

72.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, or other commingled fund (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

73.     In Revenue Sharing arrangements, a plan and a Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its services.

74.     Instead, the Fund's agreed asset-based fee includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

75.     The additional portion of the agreed-upon asset-based charge is "shared" with Plan service providers or others who do business with the plan or the Fund.

76.     As a result of these Revenue Sharing arrangements, plan service providers or others who do business with a plan or a Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

77.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

78.     Revenue Sharing is not confined to mutual funds.  Common or collective trusts, providers of GICs, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

79.      With respect to an investment option involving GICs, fees and expenses reduce the returns available to participants in three ways:  through a fee charged to manage the investment option and select the GICs in which to invest, through a fee charged by the insurance company to the plan, usually known as a "wrap fee" or "wrapper," and through the "spread," the difference between what the insurance company makes on its investment

of the money given to it by the plan and the stated rate of return it promised to pay the plan. The insurance companies involved in the GIC may charge a higher fee and then pay revenue sharing to their business partners or to plan service providers out of the fee.

80.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

81.     When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that a plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

82.     Ascertaining whether the plan administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against a 401(k) plan are reasonable and incurred solely in the interest of plan participants requires consideration whether the *total of both* the Hard Dollar (Plan and Master Trust) *and* Revenue Sharing payments paid for any category of services complies with this standard.

83.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers, Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

84.     When Revenue Sharing is foregone, the plan will not only pay additional hard dollar fees to the plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

85.     Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

86.     Such is the case here.  Most of the mutual fund investment managers charged fees to the Plans that included money with which to make Revenue Sharing payments.  However, the Defendants failed to capture the available Revenue Sharing and use it solely in the interest of the Plans and the participants and beneficiaries.

87.     As a result, when the foregone Revenue Sharing – consisting of millions of dollars – is taken into account, the participants and beneficiaries of the Plans paid unreasonably high fees for the services and/or investment management they received.

**Revenue Sharing Arrangements Are Not Disclosed to Plan Participants**

88.     Revenue Sharing is not disclosed to participants in the Plans and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

89.     Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

90.     By entering into, allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, the Defendants deprived participants in the Plans of true and accurate information regarding:

    a.   How much they are paying in fees and expenses for each Plan;

b.  Who is receiving the Plans' assets through Revenue Sharing;

c.  How much service providers are paid in addition to their disclosed, hard

dollar fees; and

d.  Whether the total amount paid to services providers (*i.e.* disclosed, hard

dollar fees *combined with* Revenue Sharing payments) is reasonable and

incurred solely for the participants' benefit.

**<u>Investment Management and Other Fees Assessed Against</u>**
**<u>Employer Stock Funds</u>**

91.    Employer stock funds or company stock funds ("Employer Stock Funds")

are an investment option in many 401(k) plans, especially those of large employers with

stock that is publicly traded on recognized stock exchanges.

92.    The Company Common Stock Fund provides participants in the Plans with

the opportunity to use a portion of their 401(k) retirement savings to purchase stock in the

company for which they work.

93.    Beyond providing an *opportunity* for participants to invest in Lockheed

Martin stock, Lockheed Martin designed its 401(k) plans so that the employer's matching

contribution is made in only the employer's stock.

94.    By their nature, Employer Stock Funds, like the Company Common Stock

Fund, are undiversified and risky, especially when they represent a disproportionately high

percentage of a 401(k) plan participant's account.

95.    While such Funds benefit employers by providing a steady market for the

employer's stock and millions – or often billions – of dollars in working capital from their

24

employees' salaries, Employer Stock Funds cause 401(k) participants to embrace the risks inherent in undiversified investing.

96.     For the typical 401(k) participant, the risk that such undiversified Employer Stock Fund imposes is greater than that of other undiversified investments.

97.     The typical 401(k) participant – before placing any retirement savings in an Employer Stock Fund – relies on the stability and financial viability of his/her employer as the basis of his/her standard of living: the participant's present salary, healthcare and other benefits, as well as his/her pension (if any) and retirement health insurance depend upon the employer's continued solvency and viability.

98.     Thus, the same risk that could impair the participant's investment in the Employer Stock Fund – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-401(k) retirement benefits.  The risks are correlated and, if realized, would financially devastate most employees and 401(k) plan participants.

99.     Recent high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

100.    Purportedly countering these concerns, plan fiduciaries who establish and administer Employer Stock Funds, including Lockheed Martin's, suggest that employees' ownership of employer stock increases the employees' concern for the financial well-being of the employer, fosters a feeling of ownership of and identification with the employer, and enhances productivity.

101.    Regardless of the risks and benefits inherent in Employer Stock Funds, from a fee and expense standpoint, they *should be* a low cost 401(k) plan investment alternative.

102.    Employer Stock Funds do not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses, and thus the largest portion of the Funds' expense ratios.  By their very nature, Employer Stock Funds forgo such investment management and hold an undiversified portfolio containing employer stock.  Therefore, Employer Stock Funds should not charge investment management fees.

103.    It is crucial to participants' returns that Plan fiduciaries ensure that these expenses are not assessed against participants' savings in Employer Stock Funds *and* that the Employer Stock Fund not hold cash on a continuous basis.

104.    Participants in the Plans invest in the Company Common Stock Fund with the goal of sharing in their employer's financial success through the receipt of dividends and/or the increase in value of their employer's stock .

105.    Participants who invest in the Company Common Stock Fund do not own shares of Lockheed Martin common stock.  They own units of the Company Common Stock Fund, just as they own units in all of the investment funds available to participants in the Plans.

106.    Each unit represents a portion of the shares of Lockheed Martin stock in the Fund *and* a portion of the cash held in the Company Common Stock Fund.

107.    The value of each Company Common Stock Unit is reduced by the fees and expenses assessed against the assets in the Fund and by the cash – rather than the Lockheed Martin stock – the Fund holds.

108.    As a result, the returns that the Plans' participants receive on their investment in the Company Common Stock Fund are and have been in general, lower than those of an investor holding a portfolio of pure employer stock outside the Plans.

109.    The amount of cash that the Company Common Stock Fund holds also reduces the extent to which participants share in their employer's success.

110.    If the value of Lockheed Martin stock is rising, or if it is paying dividends, participants in the Plans who place their retirement savings in the Company Common Stock Fund naturally want *every* dollar they save to earn such investment gains.

111.    But the portion of the participant's savings that remains in cash, and is not used to purchase the employer's securities, does not generate such investment gains. Instead, its value remains essentially the same.

112.    For example, if a *non-401(k) investor* purchases 100 shares of Lockheed Martin stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1000 gain on the initial $10,000 investment.

113.    However, participants in the Plans who place the same $10,000 in the Company Common Stock Fund do not receive 100 shares of Lockheed Martin stock. They receive units representing an interest in the shares of Lockheed Martin stock held in the Company Common Stock Fund *and* an interest in the Fund's cash.

114.    If the Company Common Stock Fund holds 4% cash and 96% employer stock, the 10% increase in the value of the employer stock will translate into a $960 gain for the participant in the Plans, instead of a $1000 earned by the non-Plan investor. The value of the cash in the Company Common Stock Fund would remain essentially static.

115.    In this example, to make matters worse, the participant in the Plans who invests $1000 in the Company Common Stock Fund will pay fees and expenses. These fees and expenses will further reduce returns.

116.    While this difference may seem modest, the Company Common Stock Fund is one of the largest investment alternatives, containing more than $5 billion as of the end of plan year 2004.  It held at all relevant times a significant amount of cash.

117.    Plan participants' returns in the Company Common Stock Fund have substantially underperformed those of complete strangers to the company investing outside of the Plans.   At times when Lockheed Martin stock was doing well, the performance of the Company Common Stock Fund significantly lagged behind the performance of Lockheed Martin common stock on the market, leading to millions of dollars lost for the Plans and their participants and beneficiaries.

118.    Even at times when Lockheed Martin common stock experienced losses, the cash did not reduce the losses experienced by participants in the Plans.  The performance of the Company Common Stock Fund continued to lag behind that of the performance of Lockheed Martin common stock on the open market.

119.    The Defendants violated their fiduciary obligations under ERISA: (A) by maintaining and holding, causing to be maintained or held, and/or allowing to be maintained or held, excess cash in the Company Common Stock Fund and thereby impairing participants' returns and (B) by causing or allowing excessive fees and expenses to be assessed against participants' accounts in the Company Common Stock Fund.

### Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches

120.    As set forth above, the Defendants did not disclose, and to this day have not disclosed, the fact that plan service providers were and/or engaging in Revenue Sharing; nor that Revenue Sharing was available for the benefit of the Plans and their participants, nor the amount of Revenue Sharing payments made by or to the Plans' service providers.

121.    Participants in the Plans did not have and do not have complete information about the fees and expenses being charged to the Plans that reduced their account balances.

122.     Thus, the Plans' fiduciaries, including the Defendants, have not told participants in the Plans, and participants in the Plans do not know:

    a.  the "annual operating expenses" of the investment options in the Plans, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(*2)(i);* and

    b.   the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A) .

123.    As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plans' fiduciaries to disclose the actual expenses in the Plans, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan."  29 C.F.R. §2550.404c-1(b)(2)(i)(B).

124.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants and beneficiaries have lacked the information necessary to understand and protect their interests in the Plans and/or to have knowledge of the Defendants' breaches of fiduciary duty.

125.    In fact, in their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

126.    The Defendants have an affirmative obligation to provide full and accurate information to the participants regarding the administration of the Plans.

127.    The Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

128.    Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

    a.   the total amount of fees and expenses reasonable and necessary to operate the Plan;

    b.   the total amount of fees and expenses the Plans actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

    c.   the availability of Revenue Sharing;

    d.   the true and accurate details regarding the revenues and expenses of the Plans;

    e.   the true and accurate operating expenses which reduce particpants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plans' investment alternatives;

    f.   the true and accurate transaction fees and expenses which affect the participants' accounts in connection with the purchase or sale of investment alternatives;

    g.   the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plans' expenses exceeded those which were reasonable and incurred solely in participants' interests; and

    h.   other revenue and expense information necessary for the participants to understand and protect their interests in the Plans.

129.    Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c), and are liable for investment losses.

130.    Based upon the foregoing, the statute of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
### Breach of Fiduciary Duty – ERISA §502(a)(2)

131.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 130 as though fully set forth here.

132.     As set forth in detail above, the Defendants owe the Plans, their participants and beneficiaries, and the Classes extensive fiduciary duties including, without limitation:

a.   To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plans;

b.   To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c.   To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans;"

d.  To track and account for all transactions involving the Plans and Plan assets so as to ensure that Plans' assets are retained, managed, and disbursed in compliance with the Plans' Document and ERISA;

e.  To track and account for all transactions involving the Plans and Plans' assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans;"

f.  To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g.  In entering into agreements with service providers to the Plans, to ensure that the payments from the Plans – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

h.  In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

i.  In operating and administering the Plans,  on an ongoing basis to monitor the payments made by the Plans to service providers – whether they are direct or indirect – are and remain reasonable for the services provided

and made for the sole and exclusive benefit of Plan participants and beneficiaries;

j.   To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

k.   To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l.   To communicate with Plan participants and beneficiaries regarding the Plans honestly, clearly and accurately;

m.   To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plans; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n.   Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plans and the expenses incurred in doing  so;

o.   To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions; and

33

p.   To appoint fiduciaries who were capable of living up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove any fiduciaries who breached their fiduciary duties.

133.   As set forth in detail above, the Defendants breached their fiduciary obligations to the Plans, Plan participants and beneficiaries and the members of the Salaried Plan and HSP Plan Classes by, among other conduct to be proven at trial:

a.   Causing the Plans to enter into agreements with service providers under which the Plans pay/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries;

b.   Allowing the Plans to pay – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

c.   Failing to monitor the fees and expenses paid by the Plans and, by such failure, causing and/or allowing the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

d.   Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

34

e.   Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f.   Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants and beneficiaries of the Plans;

g.   Failing to communicate with participants and beneficiaries of the Plans regarding the Plans honestly, clearly and accurately;

h.   Failing properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

i.   Failing to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transactions, fees and expenses which affect participants' account balances in connection with the purchase or sale of interests in investment alternatives;

j.   Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plans;

k.   Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the performance of their duties, and failing to remove any fiduciaries who breached their fiduciary duties;

l.      By the foregoing conduct, failing to exercise the care, skill,

prudence and diligence that a prudent person would when acting in

like capacity and familiar with such matters.

134.    As set forth in detail above, as a result of these breaches, Plaintiffs, the

Salaried Plan and HSP Plan Classes, the Plans, and the participants and beneficiaries of

the Plans have suffered financial losses.

135.    Further, as set forth in detail above, the Defendants failed to provide

participants and beneficiaries with sufficient investment information to qualify for the

safe harbor immunity of section 404(c).  Accordingly, the Defendants are liable for

participants' and beneficiaries' investment losses in the Plans.

136.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the

Defendants are liable to restore to the Plans the losses they experienced as a direct result

of the Defendants' breaches of fiduciary duty and are liable for any other available and

appropriate equitable relief, including prospective injunctive relief and declaratory relief,

and attorney's fees.

## <u>COUNT II:</u>
### Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)

137.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1

through 136 as though fully set forth here.

138.    As an alternative to the causes of action stated in Count I, Plaintiffs seek

further relief pursuant to ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3).

139.    Under section 502(a)(3), a participant may enjoin any act which violates

ERISA or may obtain other appropriate equitable relief to redress such violations or

enforce the terms of ERISA.

140.    The Defendants, as fiduciaries of the Plans, occupy a position of trust and confidence in connection with the Plans, the Plans' assets, and participants and beneficiaries of the Plans.

141.    The Defendants have exclusive discretion and control over the Plans' assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan[s] and their beneficiaries and defraying reasonable expenses of administering the Plan[s]."

142.    Although *only* participants and beneficiaries are entitled to the Plans' assets and to the benefit of the Plans' assets, in the absence of full and candid disclosure from the Defendants, participants and beneficiaries of the Plans do not know, and have no means of knowing, how their assets have been managed and disbursed.

143.    Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plans, their assets, and their participants and beneficiaries.

144.    As set forth in detail above, the Defendants have caused and/or allowed the Plans to pay – directly or indirectly – excess fees and expenses to the Plans' service providers.

145.    The Defendants, and not the Plaintiffs, have and/or should have specific and detailed information regarding how the Plans' assets have been treated and disbursed in this regard.

146.     Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plans and their assets.

147.    Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plans and/or paid to third parties, whether paid directly by the Plans or indirectly transferred among the Plans' service providers or other third parties.

148.    Plaintiffs respectfully request that, to the extent that the Defendants do not or cannot account for all such transactions and their propriety under ERISA, the Plan Document and other applicable law, the Court surcharge against the Defendants all amounts for which they cannot account.

149.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plans' participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries of the Plans, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position each would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plans in the amount of their monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plans all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.


**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**


Dated:  September 11, 2006                Respectfully submitted,


                                          **Schlichter, Bogard & Denton**

                                          ___/s/ Jerome J. Schlichter___
                                          Jerome J. Schlichter
                                          Elizabeth J. Hubertz
                                          Heather Lea
                                          120 W. Main Street

Suite 208
Belleville, IL 62220

100 South Fourth Street, Suite 900
St. Louis, MO 63102
Tel:     314-621-6115
Fax:     314-621-7151
jschlichter@uselaws.com
ehubertz@uselaws.com
hlea@uselaws.com
Counsel for Plaintiffs