**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

ANTHONY ABBOTT, ERIC )
FANKHAUSER, LLOYD DEMARTINI, )
JACK JORDAN and DENNIS )
TOMBAUGH, individually and )
on behalf of all those similarly situated, )
)
     Plaintiffs, )
)
vs. )     **Case No. 06-cv-0701-MJR**
)
LOCKHEED MARTIN )
CORPORATION and LOCKHEED )
MARTIN INVESTMENT )
MANAGEMENT COMPANY, )
)
     Defendants. )

<u>ORDER AND MEMORANDUM</u>

REAGAN, District Judge:

### I.  <u>Introduction and Factual Background</u>

       Plaintiffs, Anthony Abbott, Eric Fankhauser, Lloyd DeMartini, Jack Jordan and

Dennis Tombaugh, individually and on behalf of all similarly situated persons, filed this action

pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002 *et seq.*

("ERISA"). Specifically, Plaintiffs allege that Defendants, Lockheed Martin Corporation ("LMC"),

as Administrator for the Plans, and Lockheed Martin Investment Management Company

("LMIMCo"), which handles investment matters, breached their fiduciary duties under ERISA with

regard to two employee benefits plans: the LMC Salaried Savings Plan ("SSP") and the LMC

Hourly Savings Plan ("HSP") ("the Plans"). Abbott is a participant in the HSP and seeks to

represent the HSP Class; Fankhauser, DeMartini, Jordan and Tombaugh, are participants in the SSP

and seek to represent the SSP class.

Since 1995, State Street Bank & Trust Company ("State Street"), with its affiliates, has served as trustee and recordkeeper for the Plans as well as the investment manager for several of the Plans' investment fund offerings. In 2000, State Street assigned its recordkeeping responsibilities to CitiStreet, a partly-owned subsidiary. State Street received direct compensation from LMC as well as indirect compensation, revenue sharing, from certain of the Plans' outside investment managers.

The Plans offer an array of investment choices, including core funds, asset allocation funds and a self-managed account. The core funds, which generally included 11 options, ranged in risk from the conservative Stable Value Fund to the more aggressive Company Stock Fund and Employee Stock Ownership Plan Funds (collectively, "company stock funds"). Three asset allocation funds provided diversified asset portfolios offering conservative, moderate and aggressive risk options. In 2001, the Plans added the self-managed account ("SMA"), which allowed participants to invest up to half of their retirement savings in a portfolio of their own choosing, including stocks, bonds and more than 9,000 mutual funds from more than 300 fund families.

The Stable Value Fund ("SVF") invests in United States Treasury bills, commercial paper, banker's acceptances and notes, savings bank deposits, money market funds and other short-term fixed securities. It also invests in contracts with insurance companies, known as guaranteed investment contracts ("GICs"), wherein the insurer promises to repay the principal and a contractually-fixed rate of interest over a specified period of time.

The company stock funds are structured as unitized funds, *i.e.*, each investor owns "units" of the stock funds rather than actual shares of stock. Unit trades are settled in one day rather

than in the three-day settlement period typical of selling stock in open market trading. A portion of the funds' assets are held in cash to provide liquidity for daily processing of fund transfers and withdrawals.

Information about the various funds' objectives, composition, past performance, expected fees and disclosures are provided in periodic Summary Plan Descriptions ("SPDs") as well as in formal and informal updates to the SPDs, annual reports and periodic personal statements. Additionally, information is available on a website accessible to Plan participants, which includes quarterly reports by the fund-rating agency Morningstar regarding the composition of each fund as well as an analysis of its risk and return.

Defendants have moved for summary judgment (Doc. 145), and Plaintiffs have moved for partial summary judgment (Doc. 149). The parties have fully briefed these motions, and they were the subject of a hearing held on March 6, 2009. First setting forth the standards that guide its analysis, the Court now rules as follows.

## II. Legal Standards

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. **FED. R. CIV. P. 56(c).** The moving party bears the burden of establishing both the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metropolitan Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997).** In determining whether a genuine issue of material fact exists, the Court reviews the record in the light most favorable to the non-moving party and makes all reasonable inferences in the non-movant's favor. *Anderson,* **477 U.S. at 255;** *Ulichny v. Merton Community School Dist.*, **249 F.3d 686, 699 (7th**

**Cir. 2001);** *Miranda v. Wisconsin Power & Light Company***, 91 F.3d 1011, 1014 (7th Cir. 1996).**

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. *Oest v. IDOC***, 240 F.3d 605, 610 (7th Cir. 2001);** *Moore v. J.B. Hunt Transport, Inc***., 221 F.3d 944, 950 (7th Cir. 2000).**

"ERISA section 404 imposes standards of fiduciary duty, including the fiduciary's duty to act 'with the care, skill, prudence, and diligence' as would a prudent man under the same circumstances." *Jenkins v. Yager***, 444 F.3d 916, 924 (7th Cir. 2006) (citing 29 U.S.C. § 1104(a)(1)(B)).** "To state a claim for a violation of fiduciary duty, the plaintiff must 'establish: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff.'" *Id***. (quoting** *Brosted v. Unum Life Ins. Co. of America***, 421 F.3d 459, 465 (7th Cir. 2005) (citing** *Kamler v. H/N Telecomm. Serv., Inc***., 305 F.3d 672, 681 (7th Cir. 2002)).**

The first prong of the test is satisfied because it is undisputed that Defendants are plan fiduciaries under ERISA section 3(21)(A). *See* **29 U.S.C. § 1002(21)(A).** Under the second prong, a plan administrator is held "to a duty of loyalty akin to that of a common-law trustee" and "must act as though [he] were a reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Id***. (quoting** *Ameritech Benefit Plan Comm. v. Comm. Workers of America***, 220 F.3d 814, 825 (7th Cir. 2000)).** The third prong requires Plaintiffs to establish the requisite causation to state a claim for breach of fiduciary duty and that the breach of that duty caused harm to Plaintiffs. *Id***. at 928.**

# III. <u>Analysis</u>

## A.      <u>Revenue sharing</u>

Both parties have filed for summary judgment on the issue of revenue sharing. Plaintiffs claim that the facts establish that LMC and LMIMCo breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1) and 1106(a)(1)(C) by failing to monitor and determine the reasonableness of fees that State Street received from the assets of LMC's 401(k) Plans and by allowing State Street to receive unreasonable compensation for its services.  Citing DOL Advisory Opinion 97-16A, Plaintiffs submit that LMC and LMIMCo had a duty to regularly monitor all revenue sharing to ensure that compensation paid directly or indirectly for plan services, such as administration and record-keeping, were reasonable.

Plaintiffs contend that LMC and LMIMCo did not perform this duty or even attempt to determine what revenue sharing payments the Plans' service providers - State Street and CitiStreet - received from State Street Global Advisors ("SSgA") mutual funds and investments.  As a consequence, according to Plaintiffs, Lockheed failed to determine that service provider fees for State Street and CitiStreet were reasonable.  Specifically, Plaintiffs claim that "[l]umping all Plan fees together to determine reasonableness does not satisfy ERISA's fiduciary duties because that allows reasonable fees to balance out unreasonable fees and gives license to fiduciaries to allow unreasonable compensation to one service provider so long as other service providers receiving [sic] reasonable compensation."

LMC and LMIMCo submit that Plaintiffs' allegations regarding revenue sharing do not give rise to a claim for fiduciary breach.  They claim that it is well established that revenue sharing does not inherently violate ERISA.  According to LMC and LMIMCo, all fees paid by the

Plans were disclosed, and there is no legal basis for Plaintiffs' contention that Plan fiduciaries must disclose internal revenue allocation separately. Additionally, LMC and LMIMCo state that LMC purchased bundled services from State Street, and, in a bundled arrangement, a fiduciary monitors whether total costs are reasonable for the total services provided.

The briefing of this issue was completed prior to the Seventh Circuit Court of Appeals's decision in *Hecker v. Deere & Co.,* 2009 WL 331285 (7th Cir. 2009).[1] The parties filed supplemental briefs addressing the impact of *Hecker* on Plaintiffs' claims. Plaintiffs' attempt to distinguish the appellate court's decision fails.

Indeed, distinguishing *Hecker* on the issue of revenue sharing is an uphill battle that Plaintiffs cannot win. A line-by-line comparison of the Second Amended Complaint ("SAC") in *Hecker* and the FAC in the current proceeding reveals that, taking into account certain factual differences that are not material to the Court's analysis, the complaints are the same - the same claims regarding hard dollar payments and revenue-sharing payments, total fees, foregone revenue sharing and undisclosed revenue sharing arrangements. *Cf.* Doc. 137, FAC ¶¶ 58-87, Doc. 187, Exhibit 2, SAC ¶¶ 62-90.

In *Hecker,* the appellate court agreed with the district court that the type of revenue-sharing arrangement described by Plaintiffs "violates no statute or regulation." **Hecker, 2009 WL 331285 at 9**. The Court explained that "the participants were told about the *total* fees imposed by

---

[1]The Court relies on the *Hecker* case knowing that a Petition for Rehearing *en banc* has been filed (see Doc. 64 of the Appeals Court Docket Sheet) and that Judge Wood has permitted the filing and dissemination of some *amicus* briefs (Docs. 71,72). As of this writing, *Hecker* remains the law governing some of the issues in the instant case and unless *Hecker* is modified, will so remain.

the various funds, and the participants were free to direct their dollars to lower-cost funds if that was what they wished to do." *Id*. **(emphasis added)**.  The Court then reasoned, "The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." *Id*.

The undersigned Judge also finds no evidence that LMC and LMIMCo breached the general fiduciary duty imposed on them by 29 U.S.C. § 1104(a)(1) either by an intentionally misleading statement or a material omission.  *See id.*  First, Plaintiffs herein were told about the total fees through SPDs and other plan documents.  The FAC does not allege that any representation in the SPDs was an intentional misrepresentation.  Second, because the total fee is the critical figure, the omission of information about the revenue-sharing arrangement is not material.  *See id.*

In light of the Seventh Circuit's decision in *Hecker*, Plaintiffs' motion for partial summary judgment based on revenue sharing must be denied, and LMC's and LMIMCo's motion for summary judgment must be granted on this issue.

**B.     Notice-pleading requirements**

Before considering Plaintiffs' remaining claims, the Court will address claims regarding "float" and the American Century Growth Fund ("ACGF"), also referred to as the American Century Fund.

"[C]laims of breach of fiduciary duty under ERISA are subject to no pleading standard more stringent than Rule 8 of the Federal Rules of Civil Procedure, which requires a plaintiff to present only 'a short and plain statement of the claim showing that the pleader is entitled to relief'  and states that '[e]ach averment of a pleading shall be simple, concise, and direct.' " *Spano v. Boeing Co.,* WL 1149192, 2  (S.D.Ill. 2007) (citing FED.R.CIV.P. 8(a)(2), (e)(1); *In re*

*Enron Corp. Sec., Derivative & ERISA Litig.*, **284 F.Supp.2d 511, 652 (S.D.Tex. 2003)** (**"ERISA does not have heightened pleading requirements, but is subject to the notice pleading standard of [Rule 8],** *i.e.***, ... a short and plain statement of the claim showing that the pleader is entitled to relief ... and that provides a defendant with fair notice of the claim against him."** ) (**additional citations omitted**).

At the March 6, 2009, hearing, the parties briefly raised the issue of float. "Float is interest earned by cash while invested before participant contributions are allocated to investments or before distributions are processed." *Taylor v. United Technologies Corp.*, **2009 WL 535779, 7 (D.Conn. 2009)**. A careful review of the FAC reveals no claim of "float." Furthermore, it is not addressed in LMC's and LMIMCo's motion for summary judgment. For these reasons, the Court makes no findings as to float.

The Court has also thoroughly perused the FAC for claims regarding ACGF. It appears that Plaintiffs seek to raise claims against ACGF under an umbrella of claims regarding LMC's and LMIMCo's alleged failure to reduce fees and expenses. While Plaintiffs make very specific claims regarding the SVF (FAC, ¶¶ 128-131, 141-44, 151 (g)-(j)) and the company stock funds (¶¶ 88-116, 145), they make no specific allegations regarding ACGF. Apparently, the claim - as gleaned from the parties' submissions and the in-court hearing- is that LMC and LMIMCo should not have offered ACGF as a mutual fund but rather as a separate account managed only for the Plans because such a large account could have negotiated lower investment fees. The issue is set out in general terms in FAC, ¶ 37,

> Participating employees may choose to invest Salaried Plan or HSP Plan contributions in any of thirteen investment funds. Five of these funds are retail mutual funds, the same mutual funds available for retail purchase, by any investor, large or small, on the open market. Although the Plans, as large investors, would

qualify for the purchase of "institutional" mutual fund shares, which charge substantially lower fees than the standard shares offered to retail customers, the Plans did not make these available to participants in all of the mutual fund investment options. FAC, ¶ 37.

This allegation, however, is insufficient to put LMC and LMIMCo on notice of a claim of imprudence regarding ACGF. To satisfy the notice-pleading requirements of Rule 8(a)(2), a plaintiff must provide the grounds of his entitlement to relief by saying enough "to raise a right to relief above the speculative level." ***Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1965-66 (2007)**. If Plaintiffs wished to identify ACGF as part of this case, they could have made specific and extensive allegations as they did regarding the SVF and the company stock funds. Even affording Plaintiffs' FAC a very liberal construction, their failure to meet the pleading requirements of Rule 8(a) on regarding the ACGF is fatal to this claim.

In the alternative, if the claim regarding the ACGF is within the scope of the complaint or has been included by implied consent, *see Torry v. Northrup Grumman Corp.,* 399 F.3d 876 (7th Cir. 2005), nonetheless, on the basis of *Hecker*, it must be dismissed.

Plaintiffs claim that the investment in the ACGF, a retail mutual fund, was imprudent because a giant 401(k) plan such as LMC's and LMIMCo's plan has enormous bargaining power to command lower fees. According to Plaintiffs, LMC's and LMIMCo's failure to consider a separate account was a breach of their fiduciary duty of prudence. Plaintiffs submit that the ACGF fund was by far the most expensive investment option in the Plans, charging more than double the fees of nearly every other investment option. They maintain that a separate account would have charged only 25% of the retail mutual fund rate, which would have saved the Plan $41.25 million in excessive fees. Plaintiffs contend that LMC's and LMIMCo's claims regarding the need for liquidity are without basis.

LMC and LMIMCo contend that the ACGF is a prudent investment option. They maintain that they considered and rejected making a change to a separate account in 2002 because of concerns of illiquidity but established it as a separate account in 2007 when circumstances had changed. LMC and LMIMCo submit that, in 2002, the benefits of liquidity and economies of scale outweighed the advantages of a separate account. They assert that additional non-fee considerations weighed in favor of maintaining the mutual fund structure for the ACGF, including SEC oversight and review, better access to information showing returns, greater familiarity and portability.

The Seventh Circuit's decision in *Hecker* is dispositive of this issue. The Plan at issue in *Hecker* included 23 different Fidelity *retail* mutual funds. ***Hecker*, 556 F.3d at 578-79**. The appellate court considered it important that "all of these funds were also offered to investors in the general public, and so the expense ratios necessarily were set against the backdrop of market competition." ***Id.* at 586**. The Court explained that it found "no statute or regulation prohibiting a fiduciary from selecting funds from one management company" and, furthermore, that nothing in ERISA "require[d] plan fiduciaries to include any particular mix of investment vehicles in their plan." ***Id***.

Similarly, in the current proceeding, LMC and LMIMCo offered a wide variety of investment options, including the ACGF retail mutual fund. It was offered to participants on the same basis as to the general public, which guaranteed a competitive expense ratio. No statute or regulation requires a finding that LMC and LMIMCo were imprudent in offering the ACGF as a mutual fund rather than a separate account, and certain benefits flowed from that decision. For these reasons, the Court concludes that no breach of fiduciary duty on LMC's and LMIMCo's part has been described, and summary judgment in favor of LMC and LMIMCo is warranted as to Plaintiffs'

claims regarding ACGF.

## C.    Statute of Limitations

ERISA imposes a statute of limitations on claims alleging a breach of fiduciary

duties.  Section 413 provides as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.  **29 U.S.C. § 1113**.

The Court finds that the six-year statute of limitations applies here, so that any claims

accruing prior to September 11, 2000, are foreclosed.  There is no evidence that participants had

actual knowledge of a breach three years prior to filing this action.  Moreover, "[t]here is no

'continuing violation' theory to claims subject to ERISA's limitation period." ***Kanawi v. Bechtel***

***Corp***.**, 590 F.Supp.2d 1213, 1225 (N.D.Cal. 2008) (citing *Phillips v. Alaska Hotel & Rest.***

***Employees Pension Fund,* 944 F.2d 509, 520 (9th Cir. 1991) (concluding that the continuing**

**violation theory could not be applied because it would read the "actual knowledge"**

**requirement out of the statute)**.

Plaintiffs contend that the tolling provision of § 1113 applies because LMC and

LMIMCo engaged in multiple acts of fraudulent concealment.  Defendants respond that Plaintiffs

cannot satisfy the prerequisite that claims of fraudulent concealment must be pled with particularity in the complaint.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." **FED.R.CIV.P. 9(b);** *see Jones v. Hoosman,* **2006 WL 1302524, 1 (N.D.Ill. 2006) (collecting cases)**. Under Rule 9(b), the complaint must specifically allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Rogers v. Baxter Intern., Inc.***, 417 F.Supp.2d 974, 985 (N.D.Ill. 2006) (quoting** *Sears v. Likens***, 912 F.2d 889, 893 (7th Cir.1990)**. "In other words, a plaintiff must allege 'the who, what, when, where and how' of the fraud." *Id.***(quoting** *DiLeo v. Ernst & Young***, 901 F.2d 624, 627 (7th Cir.1990)**. Plaintiffs' FAC contains no allegations that satisfy Rule 9(b)'s heightened pleading requirements.[2] For this reason, the tolling provision of § 1113 does not apply, and the six-year statute of limitations forecloses claims before September 11, 2000.

The Court does not agree, however, with LMC's and LMIMCo's rather blithe assertion that *all* of Plaintiffs' claims are barred thereby because they have identified no discrete acts within the six-year limitations period. Rather, the Court narrows its inquiry to acts that took place on or after September 11, 2000.

### D. Standing

LMC and LMIMCo contend that Plaintiffs lack standing to raise claims involving

---

[2]Although Plaintiffs claim that revenue sharing arrangements were not disclosed to Plan participants, FAC, ¶¶ 85-87, the Court found, *supra,* that the type of revenue-sharing arrangement described by Plaintiffs violated no statute or regulation because it is the total fee that is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment.

the Company Stock Fund, the SVF and ACGF. The Court has already determined that claims regarding ACGF must be dismissed and, so, need not consider the challenge of standing as to ACGF. As to the Company Stock Fund and the SVF, LMC and LMIMCo assert that Plaintiffs have produced no evidence that they ever invested in either of these funds and, consequently, they could not have been injured by LMC's and LMIMCo's alleged imprudent handling of these funds. According to LMC and LMIMCo, Plaintiffs also fail to satisfy the standards for third-party standing necessary to sue on behalf of other Plan participants who were, in fact, invested in those particular funds.

Plaintiffs respond that any plan participant may bring an action to compel a fiduciary to make good to the plan losses resulting from the fiduciary's breach. They assert that LMC and LMIMCo do not dispute that Plaintiffs are participants in the Plans in this case.

"Article III of the United States Constitution requires a party to demonstrate standing by alleging that: (1) the party suffered actual or threatened injury as a result of alleged illegal conduct by defendant; (2) the injury is fairly traceable to the challenged action, and (3) the injury is redressable by a favorable decision." *George v. Kraft Foods Global, Inc.*, **251 F.R.D. 338, 345 (N.D.Ill. 2008) (citing** *Valley Forge Christian College v. Americans United for Separation of Church and State,* **454 U.S. 464, 472 (1982)**). Stated another way, Plaintiffs must show a likelihood that the injury they have suffered will be redressed by a favorable outcome to the litigation. *Lujan v. Defenders of Wildlife,* **504 U.S. 555, 560-62 (1992)**. "While standing doesn't depend on the merits of a plaintiff's contentions, 'it often turns on the nature and source of the claim asserted ... the standing question ... is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'"

*Winarski v. Nannenga,* **2005 WL 1221594, 4 (N.D.Ind. 2005) (citing *Warth v. Seldin,* 422 U.S. 490, 500 (1975) (quotations and citations omitted))**.

The statutory provisions of ERISA "unambiguously grant[] the plaintiffs the standing needed to bring their claims." *Id*. "29 U.S.C. § 1132(a)(2) specifically identifies participants and beneficiaries as parties who may sue fiduciaries on behalf of a plan for alleged breaches." *Id*. **(citing *Massachusetts Mut. Life Ins., Co. v. Russell,* 473 U.S. 134, 140 (1985) ("There can be no disagreement with the ... conclusion that § 502(a)(2) [29 U.S.C. § 1132(a)(2) ] authorizes a beneficiary to bring an action against a fiduciary who has violated § 409 [29 U.S.C. § 1109]"))**. "[N]ot only is the relevant fiduciary relationship characterized at the outset as one 'with respect to a plan,' but the potential personal liability of the fiduciary is 'to make good *to such plan* any losses *to the plan* ... and to restore *to such plan* any profits of such fiduciary which have been made through use of assets *of the plan*....'" *Russell*, **473 U.S. at 140 (emphasis in original)**. "When the statutory language provides a clear answer to a question of standing, the court's analysis ends there." *Winarski,* **2005 WL 1221594 at 4 (citation omitted)**.

The Court concludes that as participants in the Plans, Plaintiffs have standing to recover the damages LMC and LMIMCo owe to the Plans under 29 U.S.C. § 1109.

E.      <u>Excessive fees</u>

The Court turns to Plaintiffs' assertion that LMC and LMIMCo violated their fiduciary duties by selecting Plan options with unreasonably high fees for the services and management they received. The Court's analysis is again guided by the *Hecker* decision. Therein, the Seventh Circuit noted that Deere had offered a "sufficient mix of investments for their

participants" and that "no rational trier of fact could find ... that Deere failed to satisfy that duty." *Hecker*, **2009 WL 331285 at 10**. The Court explained that the expense ratios among the available funds, finding that they varied between .07% and just over 1%. The Court reasoned that it was important that "all of these funds were also offered to investors in the general public, and so the expense ratios necessarily were set against the backdrop of market competition. The fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Id*.

Applying this analysis to the current proceeding, the Court first finds that LMC and LMIMCo have provided participants with a wide array of investment opportunities, including core funds, asset allocation funds and a self-managed account. The question then is whether the overall fees paid by the Plans were reasonable.

LMC and LMIMCo maintain that LMC Plan participants paid below-market fees and received a high-value product in return. They submit that, from 2000 through 2007, they participated in an annual benchmarking survey of fees for large 401(k) plans conducted by Cost Effective Measurement, Inc. ("CEM"), an independent industry benchmarking company. They contend that in all eight years, the Plans' fees were well below the CEM average. For example, in CEM's August 31, 2001, report, it found that the Plan's total cost was 27 basis points ("bp"), compared to "the universe average cost of 36 bp". Doc. 146, Exh. 8, p. 14. CEM explained that its calculated benchmark cost for the Plan was 28 bp, which suggested that "overall your plan is normal cost." *Id*. at 15. The benchmark cost was calculated based on the Plan's unique size and asset mix. *Id*.

LMC's and LMIMCo's expert, Ellen Hennessy, asserted that her opinion was confirmed by another study of 2005 plan expenses of large plans, conducted by NERA, which "shows that Lockheed Martin Plans' expenses of 18 basis points for that year were below average for plans of comparable size[.]" Doc. 146, Exh. 18, Ellen Hennessy Expert Report ¶ 15.

Plaintiffs, however, contend that there is no evidence that Plan fees were reasonable. They maintain that the documents submitted by LMC and LMIMCo indicate their own unreliability, in that they contain disclaimers regarding accuracy and completeness. For example, the CEM report states, "Comparisons of total costs are less meaningful because, as our research has shown, costs are impacted by many variables[.]" Doc. 146, Exh. 8, p. 14. The report also notes its limitations, specifically, that the benchmark cost equation is a "useful starting point in overall plan cost analysis" but that it "does not provide insight into the reasonableness of costs at the individual investment option level." *Id.* at p. 16. Furthermore, the report recommends that LMC and LMIMCo purchase a "detailed DC Fiduciary Oversight Report," which would ensure that they "comply with [their] fiduciary obligation to monitor each individual investment option [they] provide [their] participants on both a return performance and cost basis." *Id.*

Moreover, Plaintiffs' expert, Al Otto, opined, "The plan's costs for administration and recordkeeping were excessive from 1997 through at least 2006.[3] This resulted in more than $147 million in damages to the SSP and HSP participants over that time frame." Doc. 164, Exh. 5, Al Otto Expert Report ¶ 51. While Mr. Otto's opinion is flawed for purposes of this analysis because he considered revenue sharing, float and years outside the limitations period in arriving at

---

[3]Defendants moved to exclude certain testimony and evidence from Plaintiffs' experts, including Otto and Miller, who are cited herein. By separate Order this day, the Court denied Defendants' motion.

his conclusions, *see id.* ¶¶ 54-57, his determination that the Plans' fees were unreasonable and cost the Plans millions in damages cannot be entirely disregarded.

Because genuine issues of material fact remain regarding whether LMC and LMIMCo violated their fiduciary duties by selecting Plan options with unreasonably high fees for the services and management they received, summary judgment on this issue is not warranted.

### F.    The Stable Value Fund

The stated objective of the SVF was "to provide safety of principal, stable income and liquidity." Doc. 146, Exh. 3A, p. 4. In order to meet this objective, the Fund invested in a variety of low-risk investment vehicles, including U.S. Treasury bills, corporate bonds and GICs. *Id.* Plaintiffs contend that LMC's and LMIMCo's imprudent selection of investments in the SVF resulted in significant underperformance and loss of retirement income. They submit that despite its name and objectives, it was not in fact a stable value fund but, rather, was administered as a money market fund.

Plaintiffs submit that the SVF was imprudent because it should have had no more than 5% of its assets invested in money market funds instead of the 50% to 99% that was actually invested. According to Plaintiffs, the SVF's return was so poor that it did not beat inflation by a sufficient margin to provide a meaningful retirement asset. Plaintiffs contend that, although the SVF was low-risk and did not lose its value, mere preservation of principal was not the Fund's sole objective.

LMC and LMIMCo contend that (1) the strategy and composition of the SVF was always fully disclosed to Plan participants; (2) there is no uniform definition of "stable value" that

the SVF violated; and (3) the composition of the SVF was prudent. They submit that the Court's analysis is governed by *DeBruyne v. Equitable Life Assur. Soc.,* 920 F.2d 457 (7th Cir. 1990). *DeBruyne* involved a retirement plan which included an option, the Balanced Fund, which attempted to find a compromise between risk and return by creating a "balanced" portfolio of equity and debt securities. ***DeBruyne*, 920 F.2d at 460**. In its prospectuses, Equitable disclosed that the Fund would include common stocks, publicly-traded debt securities, and money market instruments. ***Id***. Equitable repeatedly disclosed that the "mix" of security in the Balanced Fund was determined by the portfolio manager and was constantly changing. ***Id***. Plaintiffs in *DeBruyne* charged, *inter alia,* that Equitable failed to manage the Fund in accordance with plan documents and failed to manage the Fund with care and prudence. ***Id.* at 462**.

In affirming the district court's grant of summary judgment in favor of the defendants, the Seventh Circuit Court of Appeals found that the prospectuses and reports gave Equitable "broad discretion" in deciding the mix of investments in the Balanced Fund. ***Id***. **at 464**. The Court further found that using the term "balanced" did not "wed [the Fund] to a pre-established definition that could not be changed by disclosure." ***Id***. The appellate court also concluded that what a "typical" balanced fund portfolio manager might have done in a given year said "little about the wisdom of Equitable's investments, only that Equitable may not have followed the crowd." ***Id.* at 465**.

In the Lockheed Martin SSP prospectus dated April 1, 2004, the SVF was listed as "Money Market/Stable Value" and as the most conservative of the core funds. Doc. 146, Exh. 3, p. 16. The prospectus indicated that there was a chance that the Fund's return would not exceed inflation. *Id.*, Exh. 3A, p. 4. The annual rate of return for the Fund between 2000 and 2003 varied

from 1.39% to 6.43%. *Id.*, p. 5. The booklet summarizing investment options available under the Plans, effective April 2, 2001, provided similar information regarding objective, composition and strategy for the HSP. *Id.*, Exh. 4, p. 10. In that booklet, the SVF was in the "money market" category. *Id.,* p. 4.

According to a February 7, 2003, memorandum authored by Cora Ingrim, LMIMCo's Managing Director, and read into the record at her deposition, "Our Stable Value Fund has become a money market fund. To avoid false advertising we should change the name of the fund to reflect its composition or increase duration by adding ... longer duration investments that have book value accounting." Doc. 164, Exhibit 8, Ingrim Dep., 385:13-20. Ingrim stated that in the years following this statement, there was a shift in portfolio assets from money market to stable value products within the Fund. *Id.* 386:6-10. Ingrim used the term "false advertising" to describe telling participants that they were getting more risk than was true. *Id.* 388:3-5.

As in *DeBruyne*, using the term "stable value" does not "wed" the Fund to a specific mix of investments. That does not mean, however, that the Fund need not be managed in accordance with plan documents and with care and prudence. The plan documents indicate that the return on investments in the SVF was to be bolstered beyond the relatively low return of a money market by investment in other instruments such as Treasury bills, corporate bonds and GICs. The concerns expressed by Ingrim lead the Court to conclude that LMIMCo itself had grave doubts about the composition of the Fund. She felt it was necessary to "strong arm" the Fund into making changes to avoid falsely leading participants to believe that they were getting more risk - and the concomitant greater reward - than they were. While the timeframe during which this problem developed and was resolved is not clear, what is clear is that the problem was recognized and addressed during the

period relevant to the current proceedings.  For these reasons, summary judgment on this issue is not warranted.

### G.    Company Stock Funds

The company stock funds were set up as unitized investments which included both LMC stock and cash invested in State Street's Short Term Investment Fund ("STIF").  Instead of directly holding LMC stock, participants held units in a fund that could be transferred on a same-day basis.  The SPDs explain the unitized structure to participants and the impact that structure has on performance:

> The Fund is invested primarily in Lockheed Martin common stock.  However, a small portion of the Fund's assets is held in cash equivalent reserves to allow for the daily processing of fund transfers (reallocations and spot transfers) and withdrawals. Cash equivalent reserves typically range between 1% and 3% of the Fund, but may be as high as 10%.  Because the Fund also invests in cash equivalent reserves, the Fund's performance may vary from that of Lockheed Martin common stock.  Doc. 146, Exh. 3(B), p. 3 (April 1, 2004, SSP prospectus).

The SPD also explains that the fund is not diversified or managed and, accordingly, may experience "large fluctuations" based on LMC's "financial performance, stock market volatility and general economic conditions."  *Id*.  Fund expenses were expected to be .03% of assets for the Fund Manager and Trustee, and .07 to 1.0% for administrative expenses.  *Id*., p. 5.  Quarterly Morningstar reports showed actual liquidity levels, *e. g.,* as of March 31, 2005, the cash portfolio analysis reported net assets of 1.01%.  Doc. 146, Exh. 5, p. 4.

LMC's and LMIMCo's expert, Lassaad Turki, noted that the unitized structure was advantageous in that it allowed the Plan to "batch" trades over several days, which reduced the need to engage in offsetting transactions.  Doc. 146, Exh. 34 ¶ 18, Turki Expert Report. As an example,

Turki discussed trading in the Company Stock Fund in April, 2002, where the liquidity buffer and the ability to batch trades resulted in the Plan trading 3.50 million shares, which - without unitization - would have required trading 23.38 million shares. *Id.* According to Turki's calculations, at 2.8 cents per share, the cost differential for that month alone would be $570,000.00. *Id.*

Plaintiffs submit, however, that the STIF was negligently managed in that it repeatedly exceeded 10% of the Funds and at one point nearly 14% of the Funds. Plaintiffs' expert, Ross Miller, asserted that the cash holdings decreased the performance of the stock funds. He particularly discussed a problem that developed with day-traders whose activities forced the funds to maintain greater liquidity levels. Doc. 164, Exh. 7, ¶¶ 28, 29. Miller cited to an April, 2001, e-mail from Ingrim, in which she noted that the plans had "a fiduciary duty to make sure that 99% of participants are not disadvantaged by a handful of day-traders[.]" *Id.* at ¶ 21.

The Court concludes that a genuine issue of material fact exists as to whether a breach of fiduciary duty occurred when cash equivalent reserves exceeded not only the typical range of 1% to 3% of the Fund but actually exceeded the 10% ceiling established in the April 4, 2004, prospectus. The question also remains how promptly management dealt with the perceived problem of day traders.

**H.    Safe harbor**

The Court once again turns to the Seventh Circuit's analysis in *Hecker* to determine whether this action falls within ERISA's safe-harbor provisions. **29 U.S.C. § 1104(c).** Under *Hecker*, "the participant must have the right to exercise independent control over the assets in her account and in fact exercise such control" and "be able to choose 'from a broad range of investment alternatives.'" ***Hecker*, 2009 WL 331285 at 11 (quoting 29 C.F.R. § 2550.404c-1(b)(1)(ii)).**

Additionally, the Plan must meet nine criteria before the participant may be considered to have the opportunity to obtain "sufficient information to make informed decisions." *Id*. **(quoting 29 C.F.R. § 2550.404c-1(b)(2)(i)(B))**.

Where the Plan provides for individual accounts and meets all of these requirements, ERISA provides a safe harbor:

> [N]o person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary. **29 U.S.C. § 1104(c)(1)(A)(ii)**.

As in *Hecker*, Plaintiffs herein chose to anticipate the § 1104(c) defense and thereby waived other defenses. Paragraph 54 of the FAC begins, "ERISA § 404(c) provides to Plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in their 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts." Paragraphs 54 through 57 describe the information that LMC and LMIMCo was required to furnish. *Cf. Hecker*, **2009 WL 331285 at 12**. In a section entitled "Defendant's Non-Compliance with 404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches," the Complaint specifies what LMC and LMIMCo allegedly failed to do. For example, paragraph 132 accuses LMC and LMIMCo of failing to disclose that they engaged in revenue sharing. Paragraphs 133 through 140 assert that LMC and LMIMCo failed and refused to provide complete information about the fees and expenses being charged to the Plans. Paragraphs 141through 144 charge that LMC and LMIMCo misrepresented, tricked and misled participants about the composition of the Stable Value

Fund and fraudulently concealed that it was a poor retirement investment. Paragraph 145 asserts that LMC and LMIMCo deliberately provided false and misleading information regarding the amount of cash held in the company stock funds as well as covering up conflicts of interest with service providers to the Plans.

For these reasons, the Court concludes that Plaintiffs have waived the right to complain about LMC's and LMIMCo's compliance with all but the following criteria: the obligation to disclose information about fees and expenses, and the obligation to provide participants with an opportunity to obtain sufficient information to make informed decisions regarding available investment alternatives. **29 C.F.R. § 2550.404c-1**.

## IV.   Conclusion

Accordingly, the Court **DENIES** Plaintiffs' motion for partial summary judgment (Doc. 149) and **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Doc. 145), as follows:

(1)  Defendants' motion is **GRANTED** as to revenue sharing, and summary judgment is entered against Plaintiffs as to any claim regarding revenue sharing;

(2)  Defendants' motion is **GRANTED** as to ACGF, and summary judgment is entered against Plaintiffs as to any claim regarding ACGF;

(3)  Defendants' motion is **GRANTED** as to the six-year statute of limitations, and claims before September 11, 2000, are foreclosed;

(4)  Defendants' motion is **DENIED** as to whether Plaintiffs have standing to recover damages owed to the Plans under 29 U.S.C. § 1109;

(5)  Defendants' motion is **DENIED** as to whether overall fees paid by the Plans provide a basis for Plaintiffs' fiduciary breach claim;

(6)  Defendants' motion is **DENIED** as to their claim that the Stable Value Fund was properly disclosed to Plan participants and was a prudent investment option for them;

(7)  Defendants' motion is **DENIED** as to their claim that the Company Stock Funds were a prudent investment option for Plan participants; and

(8)  Defendants' motion is **DENIED** as to whether the Plans are shielded from liability by ERISA's safe harbor provision.

**IT IS SO ORDERED.**

**DATED this 31st day of March, 2009**


**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**